UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
_____

ETHEREUM VENTURES LLC,

                                 Plaintiff.

           against-

CHET MINING CO LLC and CHET
STOJANOVICH,

                        Defendants.

_____

**AFFIDAVIT OF JOHNPAUL
BARIC FOR INQUEST
SUBMISSION**

Pursuant to 28 U.S.C. §1746

Case No.:  1:19-cv-7949 (LLS)

I, **JOHNPAUL BARIC**, declare under penalty of perjury that the following is true and accurate:

1.       I am the majority owner of Aurum Capital Ventures, Inc., which is the sole owner and member of plaintiff Ethereum Ventures LLC ("Ethereum").[1]  I am also Ethereum's president.  I make this affidavit in connection with the default judgment damages inquest directed by the Court, as against defendants Chet Mining Co. LLC ("CMC") and Chet Stojanovich.  This affidavit is based upon my personal knowledge.

2.       Ethereum is in the business of cryptocurrency mining and uses crypto mining computers for those operations.  As president of Ethereum, I have been trading in cryptocurrency nearly every day since 2016.  I have also negotiated the purchase of thousands of cryptocurrency mining computers within that time.  I am intimately familiar with the different types of cryptocurrency and crypto mining computers, and the costs associated with acquiring and operating them.

---

[1]       Aurum Capital Ventures is a North Carlina corporation with its principal place of business in Raleigh, North Carolina.  Plaintiff Ethereum is a North Carolina limited liability company with its principal place of business in Raleigh, North Carolina.

3.      This case has to do with a transaction that Ethereum entered into with the defendants, Stojanovich and CMC. In short, Ethereum contracted to purchase two batches of cryptocurrency mining computers from the defendants.  Ethereum paid for the computers.  The defendants never delivered the computers.

4.      I negotiated the subject transactions for Ethereum.  Defendant Chet Stojanovich held himself out as an experienced seller of crypto mining computers and equipment, through his company CMC.  I negotiated the subject transactions with Chet Stojanovich, principally by telephone and email. During those negotiations, I was in North Carlina.[2]  At the time I was dealing with him, Chet Stojanovich's personal address and CMC's principal business address were one and the same, an apartment in New York City.

5.      During my negotiations with Mr. Stojanovich, I explained that Ethereum was in the crypto mining business, and that we intended use them to mine Bitcoin.  I am certain that Mr. Stojanovich is well aware that we were going to use them for that purpose, because that is the sole purpose of a crypto mining computer.

A.      **The First Order (Batch)**

6.      In April 2019 I negotiated with Chet Stojanovich for Ethereum to purchase 912 cryptocurrency miners from CMC, specifically model S9 Antminers.  That is a particular model of crypto miner manufactured by a company called Bitmain.

7.      During a discussion on April 24, 2019, Chet Stojanovich offered to sell the 912 model S9 Antminers for a price of $190 per miner ($173,280.00 total).  That purchase price was considerably below

---

[2]      At the time that the transactions at issue in this case occurred I lived in North Carolina.  I have since moved to Austin, Texas, but I continue to serve as president of Ethereum.

market rate for the time—the going rate at the time for S9s was approximately $400.  On behalf of Ethereum, I accepted the offer.

8.      I caused Ethereum to make a wire transfer payment to CMC that same day, April 24, 2019, in the amount of $100,000, as partial payment of the purchase price.  I made that wire transfer payment from Ethereum's account at Coastal Credit Union.  A true and accurate copy of my wire transfer receipt for that transaction, from Coastal Credit Union, is annexed hereto as **Exhibit A**.

9.      That same day (April 24, 2019), Chet Stojanovich emailed me an invoice formalizing the terms of the sale.  The invoice reflected that we had paid $100,000 of the purchase price and that the balance due was $73,280.00.  A true and accurate copy of Stojanovich's email and the attached invoice (and the email's other attachments) is annexed hereto as **Exhibit B**.[3]

10.      On April 26, 2019, Chet Stojanovich also emailed me a separate receipt for the $100,000 wire transfer payment (that I made on April 24).  A true and accurate copy of Stojanovich's email and the attached receipt is annexed hereto as **Exhibit C**.

11.      On April 29, 2019, I caused Ethereum to make another wire transfer to CMC for the remaining balance, in the amount of $73,280.00.  A true and accurate copy of the receipt for  that wire transfer (with account numbers redacted) is annexed hereto as **Exhibit D**.

**B.      The Second Order (Batch)**

12.      In May 2019, I negotiated with Chet Stojanovich, for Ethereum to purchase additional Antminer computers from CMC.  This time we were interested in purchasing Model S17s.  That is another model of crypto miner manufactured by Bitmain.

---

[3]      Line item #4 of the invoice (Exhibit B) snows the "Rate" of $190.00 per miner, and $173,280.00 total price.

13.     On May 11, 2019, Chet Stojanovich made an offer for CMC to sell Ethereum 67 Model S17s for a price of $134,000.  On behalf of Ethereum, I accepted that offer.  Chet Stojanovich subsequently emailed me a written invoice for that transaction, a true and accurate copy of which is annexed hereto as **Exhibit E**.

14.     On May 11, 2019, I caused Ethereum to pay CMC 5.69 Bitcoin toward that purchase price.  A true and accurate copy of the transaction record of that transfer from my Bitcoin wallet to the defendants' is annexed hereto as **Exhibit F**.  As of that day (May 11, 2019).

15.     The dollar value of Bitcoin fluctuates over time.  On May 11, 2019, the cash value of the 5.69 Bitcoin that I transferred to the defendants was $39,970.94.  The customary tool relied on by Bitcoin traders and crypto mining services, for historical Bitcoin value, is the index maintained by Yahoo Finance, at https://finance.yahoo.com/quote/BTC-USD/ .  One can access the value of Bitcoin on a particular date in the past by using the "Historical Data" tool at that website, and specifying the date or range of dates for which you are seeking the value.  For the purposes of this affidavit, we have used that tool to obtain the historical value for May 11, 2019, and have annexed the result hereto as **Exhibit G**.  The closing value of one (1) Bitcoin on May 11, 2019 was $7,204.77.  Therefore, the value of 5.69 Bitcoin was $39,970.94 (5.69 x $7,204.77 = $39,970.94).

**C.**     **The defendants' failure to deliver any of the machines.**

16.     Through the above described payments, Ethereum paid the defendants a total of $213,250.94 ($173,280 for the first order + $39,970.94 for the second order).

17.     By late May 2019, the defendants had not delivered any of the ordered machines.  Chet Stojanovich represented to me at the time we placed the first order that the defendants would deliver the first batch of machines by "the middle of May."  By May 27, 2019 we had not received any of the machines.  I had several discussions with Chet Stojanovich on May 27 and in the days after, in which he

failed to explain why they had not delivered the machines.  I demanded a refund for Ethereum and advised that we wanted to cancel the transactions.

18.     Meanwhile, we did receive one unexplained, partial refund from CMC on May 17, 2019. On that day, transferred Ethereum 4.85443626 Bitcoin, without any explanation of why CMC refunded that particular amount.  The closing cash value of one Bitcoin on May 17, 2019 was $7,343.90.[4] Therefore, the value of the 4.85443626 Bitcoin refund that Ethereum received on May 17, 2019 was $35,650.49.  I continued to demand refunds, but the defendants stopped responding to my outreaches, which is why Ethereum eventually started this litigation.

19.     To date, the defendants have never delivered any of the machines that Ethereum ordered (in either batch).

**D.      Ethereum's Damages**

**(i)      Refund of Purchase Price for Undelivered Miners.**

20.     As described above, Ethereum paid the defendants a net amount of **$177,600.45** in purchase price for the miners, which were never delivered ($173,280 paid to defendants for the first order + $39,970.94 paid to defendants for the second order – the refund of $35,650.49 = $177,600.45). Ethereum seeks that amount in damages.

**(ii)     Additional "Cover" Costs to Purchase Miners from Alternative Source.**

21.     In addition, due to the defendants' failure to deliver the miners, on May 28, 2019, Ethereum ordered replacement miners from a different supplier, DB Technology.  We ordered 1,200 Bitmain S9 miners (the same make and model of miner that we ordered in our first undelivered batch from the defendants).  A true and accurate copy of the invoice from DB Technology for that order is annexed

---

[4]      We have consulted the Yahoo Finance Historical Data tool (https://finance.yahoo.com/quote/BTC-USD/), which I mention above, to verify this.  Annexed hereto as **Exhibit L** is the result from Yahoo Finance.

hereto as **Exhibit H**.  We paid the purchase price to DB Technology by transferring it 58.59 Bitcoin on May 28, 2019.  A true and accurate copy of the record of that transfer from my Bitcoin wallet to DB Technology's is annexed hereto as **Exhibit I**.  The cash value of that 58.59 Bitcoin on May 28, 2019 was $510,902.46.[5]

22.     The miners we purchased from DB Technology were at the market rate of $405.50 per miner (for a total of $486,600, before shipping).  That was significantly more expensive than the below-market rate the defendants had promised.  As noted above, the defendants' price was $190 per miner.  Therefore, each miner we purchased from DB Technology was $215.50 more expensive than the undelivered S9s from the defendants.  This resulted in an additional out of pocket loss for Ethereum in the amount of $196,536.00.  I calculate this as follows:

912[6] S9 miners purchased from DB Technology x $404.50 /miner      =      $369,816

*minus*

912 S9 miners ordered (but not delivered) from defendants x $190/miner   =   $173,280

Difference = $196,536.00

23.     Ethereum seeks the additional $196,536.00 cost to buy replacement goods ("cover," as it is called) as part of its damages.

**(iii)     Lost Profits**

---

[5]     Once again, we utilized the historical data at Yahoo Finance (https://finance.yahoo.com/quote/BTC-USD/).  A true and accurate copy of that result is annexed hereto as **Exhibit J**.  The closing value of one Bitcoin on May 28, 2019 was $8,719.96.  Therefore, the closing value of 58.59 Bitcoin that day was $510,902.46.

[6]     Although we actually ordered 1,200 S9s from DB Technology (rather than just 912), I am only including the cost of 912 of the DB Technology machines in this damages calculation, to make it a one-for-one comparison against the price cost for the undelivered S9s that we ordered from the defendants.  We ordered extra S9s from DB Technology (beyond the 912) because by that point we decided to purchase more S9s rather than try to purchase Model S17s (the model of our second undelivered batch from the defendants) from another source.

24.     Finally, Ethereum also seeks additional amounts as damages for lost profits that it incurred during the period of time that it did not have the miners that it ordered from the defendants, up until the time that Ethereum received the substitute miners from DB Technology.

25.     Chet Stojanovich promised mem that the defendants would deliver us the miners that we ordered from them by "the middle of May" 2019.  For the sake of making a clear and precise damages calculation, starting from an exact date, I will use May 31, 2019 as the starting point for the calculation of lost profits.   DB Technology delivered the substitute machines to Ethereum on September 15, 2019.

26.     Annexed hereto as **Exhibit K** is a spreadsheet I have prepared which shows my calculations of Ethereum's lost profits from May 31, 2019 to September 15, 2019 (when we received the replacement machines and were able to start mining with them).[7]   The total lost profits for that period are $255,036.28.

27.     I will explain the basis for those calculations.  The calculations assume that we would have run the 912 Bitmain S9 miners from the first batch that we ordered from the defendants 24 hours per day, 7 days per week from May 31, 2019 to September 15, 2019.  It is usual and customary for crypto mining businesses to run their miners 24/7, and that is Ethereum's custom, habit and practice, both presently and in 2019.  Each vertical line item in Exhibit K gives data for a different day, starting with May 31 and ending with September 15, 2019 (they are in reverse chronological order, with September 15 being the first line item on the first page of the document).

        a.   Column A in each row shows the rate of hash price in U.S. Dollars that that a single

             Bitmain S9 miner would earn on that day, as chronicled by the publicly accessible

---

[7]     The native format of this document is an Excel spreadsheet. I understand that my attorneys will have to convert it to PDF format for electronic filing, but we can provide a native Excel copy to the Court, via email, if it prefers that format.

Hashrate Index.[8]  For example, the Exhibit shows that on September 5, 2019, the hashprice rate was 0.220218478.  At the inquest, I can testify in depth about the Hashrate Index, and how Bitmain S9 miners operate.

b.  Column B in each row shows the date.

c.  Column C in each row shows the Total Daily Revenue that our 912 S9 miners would have earned on that date, based on based on the hash price rate (from the first column).  For example, on September 5, 2019, the total daily revenue for 912 S9s would have been $2,711.33.

d.  Column D shows what our Total Daily Cost would have been to operate the 912 S9s on that date.  Our only daily operational expense for the miners is the cost of electricity.  The location where we were running our miners in 2019 was a facility in Iowa, where our daily electrical cost was a flate rate of $1,330.00 in 2019.

e.  Column in each line item shows what Ethereum's net income, or Total Daily Profit would have been on that date.   We arrive at the numbers in this column by subtracting the Total Daily Cost in Column D from the Total Daily Revenue in Column C.  For example, on September 15, 2019, our total daily profit would have been $1,381.63.  The total of Column E (Total Daily Profit) for all of the dates combined between May 31, 2019 and September 15, 2019, is $255,036.28.

28.    For the reasons set forth above and in my attorneys' accompanying papers, I respectfully request judgment against the defendants, jointly and severally, for:

---

[8]       https://hashrateindex.com/

a. **$177,600.45** to compensate Ethereum for the purchase price that it paid to the defendants for the miners that they never delivered; plus

b. **$196,536.00** to compensate Ethereum for the added expense of buying substitute miners from an alternate source ("cover" damages); plus

c. **$255,036.28** in lost profits; and

d. **Prejudgment interest** from the date that Ethereum commenced this action August 26, 2019 through the date of judgment, as addressed in the accompanying papers by my attorneys.

I HEREBY SWEAR THAT THE FOREGOING IS TRUE AND ACCURATE.

Executed on August 12, 2021

_____
JohnPaul Baric

Sworn to before me this
12th day of August, 2021

_____
Notary Public

JAHLIESE CLAIR BLOUNT
Notary ID #130299915
My Commission Expires
July 17, 2023

State of Texas
County of Travis
This Instrument was acknowledged
before me on August 12 2021
By John Paul Baric
NOTARY

10