UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
_____

ETHEREUM VENTURES LLC,

                         Plaintiff.

      against-

CHET MINING CO LLC and CHET STOJANOVICH,

                         Defendants.
_____

**PLAINTIFF'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW (INQUEST)**

Pursuant to 28 U.S.C. §1746

Case No.: 1:19-cv-7949 (LLS)

Plaintiff ETHEREUM VENTURES LLC, by and through its undersigned counsel, respectfully submits the following proposed Findings of Fact and Conclusions of Law in connection with the inquest in the above-captioned matter.

**FINDINGS OF FACT**

1. Plaintiff Ethereum Ventures LLC ("Ethereum") is a North Carolina limited liability company with a principal place of business in North Carolina. (Baric Aff.[1] ¶1 & n.1.) Ethereum's sole member is Aurum Capital Ventures, Inc., a North Carolina corporation with a principal place of business in Raleigh North Carolina. (Id.)

2. Defendant Chet Mining Co. LLC ("CMC") is a limited liability company which maintains its headquarters in New York City, New York. (Compare Neidl Aff.[2] Exh. 1 [Complaint] ¶¶8-9 to admissions in Neidl Aff. Exh. 2 [Answer] ¶¶8-9.)

---

[1]     "Baric Aff." refers to the Affidavit of JohnPaul Baric (with Exhibits) sworn to August 12, 2021, filed with these inquest papers.

[2]     "Neidl Aff." refers to the Attorney Affirmation of Benjamin F. Neidl (with Exhibits) dated August 12, 2021, filed with these inquest papers.

3. Defendant Chet Stojanovich is an individual who resides in New York City, New York. (Id.) Chet Stojanovich is the sole member of CMC. (Compare Neidl Aff. Exh. 1 [Complaint] ¶12 to admission in Neidl Aff. Exh. 2 [Answer] ¶12.)

4. Plaintiff Ethereum is in the business of cryptocurrency mining and uses crypto mining computers for those operations. Ethereum's owner and president is JohnPaul Baric. (Baric Aff. ¶¶1-2.)

5. In April 2019, Ethereum negotiated to purchase two different batches of cryptocurrency mining computers from the defendants, Chet Stojanovich and Chet Mining Co., LLC ("CMC"). (Baric Aff. ¶¶3-15.)

6. Baric conducted those negotiations on behalf of Ethereum, and Chet Stojanovich conducted those negotiations on behalf of the defendants. (Baric Aff. ¶¶3-4.) During the negotiations, Baric explained to Stojanovich that Ethereum was in the crypto mining business, and that Ethereum intended use the cryptocurrency mining computers to mine Bitcoin. (Id. ¶5.)

**A.     The First Order (Batch)**

7. Ethereum ordered a first batch of cryptocurrency mining computers from the defendants on or about April 24, 2019. In particular, Ethereum ordered 912 model S9 Antminers. That is a particular model of crypto miner manufactured by a company called Bitmain. (Baric Aff. ¶6.)

8. During a discussion between Chet Stojanovich and Baric on April 24, 2019, Stojanovich offered to sell the 912 model S9 Antminers for a price of $190 per miner ($173,280.00 total). That purchase price was considerably below market rate for the time—the going rate at the time for S9s was approximately $400. On behalf of Ethereum, Baric accepted the offer. (Baric Aff. ¶7.)

9. The same day, April 24, 2019, Ethereum made a wire transfer payment to CMC in the amount of $100,000, as partial payment of the purchase price. (Baric Aff. ¶8 and Exh. A.)

2

10.     That same day (April 24, 2019), Chet Stojanovich emailed Baric an invoice formalizing the terms of the sale. The invoice reflected that Ethereum had paid $100,000 of the purchase price and that the balance due was $73,280.00. (Baric Aff. ¶9 and Exh. B.)

11.     On April 26, 2019, Chet Stojanovich also emailed Baric a separate receipt for the $100,000 wire transfer payment. (Baric Aff. ¶10 and Exh. C.)

12.     On April 29, 2019, Ethereum made another wire transfer to CMC for the remaining balance, in the amount of $73,280.00. (Baric Aff. ¶11 and Exh. D.)

**B.     The Second Order (Batch)**

13.     In May 2019, Baric (on behalf of Ethereum) negotiated with Chet Stojanovich to purchase additional Antminer computers from CMC. This time Ethereum was interested in purchasing Model S17s. That is another model of crypto miner manufactured by Bitmain. (Baric Aff. ¶12.)

14.     On May 11, 2019, Chet Stojanovich made an offer for CMC to sell Ethereum 67 Model S17s for a price of $134,000. On behalf of Ethereum, Baric accepted that offer. Chet Stojanovich subsequently emailed Baric a written invoice for that transaction. (Baric Aff. ¶13 and Exh. E.)

15.     On May 11, 2019, Ethereum to transferred 5.69 Bitcoin to CMC toward that purchase price. (Baric Aff. ¶14.) On May 11, 2019, the dollar value f the 5.69 Bitcoin that Ethereum transferred to CMC was $39,970.94. (Id. ¶15.)

**C.     The defendants' failure to deliver any of the machines.**

16.     Through the above described payments, Ethereum paid the defendants a total of $213,250.94 ($173,280 for the first order + $39,970.94 for the second order). (Baric Aff. ¶16.)

17.     By late May 2019, the defendants had not delivered any of the ordered machines for either batch. (Baric Aff. ¶17.) Chet Stojanovich had represented to Baric at the time that Ethereum placed the first order that the defendants would deliver the first batch of machines by "the middle of May" 2019.

(Baric Aff. ¶17.)  By May 27, 2019, however, Ethereum had not received any of the machines.  (Baric Aff. ¶17.)  Baric demanded a refund for Ethereum and advised that Ethereum wanted to cancel the transactions.  (Id.)

18. On May 17, 2019, CMC did make a partial refund to Ethereum in the form of 4.85443626 Bitcoin, which had a cash value on that date of $35,650.49.  (Baric Aff. ¶18.)  CMC made that partial refund without any explanation of why CMC refunded that particular amount.  (Id.)

19. To date, the defendants have never delivered any of the machines that Ethereum ordered (in either batch).  (Baric Aff. ¶19.)

**D.    Ethereum's Losses**

 **(i)    Refund of Purchase Price for Undelivered Miners.**

20. As described above, Ethereum paid the defendants a net amount of **$177,600.45** in purchase price for the miners, which were never delivered ($173,280 paid to defendants for the first order + $39,970.94 paid to defendants for the second order – the refund of $35,650.49 = $177,600.45). Ethereum seeks that amount in damages.  (Baric Aff. ¶20.)

 **(ii)    Additional "Cover" Costs to Purchase Miners from Alternative Source.**

21. In addition, due to the defendants' failure to deliver the miners, on May 28, 2019, Ethereum ordered replacement miners from a different supplier, DB Technology.  (Baric Aff. ¶21.)  Ethereum ordered 1,200 Bitmain S9 miners (the same make and model of miner that it ordered in its first undelivered batch from the defendants).  (Baric Aff. ¶21 and Exh. H.)  On May 28, 2019, Ethereum paid DB Technology $510,902.46 in Bitcoin for those substitute machines.  (Baric Aff. ¶21 and Exhs. I and J.)

22. The miners that Ethereum purchased from DB Technology were at the market rate of $405.50 per miner (for a total of $486,600, before shipping).  That price per unit was $215.50 more expensive per machine than the price at which the defendants had promised to sell the 912 model S9s.

4

(Baric Aff. ¶22.)  Therefore, in purchasing substitute machines from DB Technology, Ethereum paid $196,536.00 more for 912 S9 miners than it paid the defendants for the undelivered miners.  (Baric Aff. ¶22.)

### (iii) Lost Profits

23. Ethereum lost profits as a result of the defendants' failure to deliver the cryptocurrency miners in May 2019.  (Baric Aff. ¶¶24-27.)  Specifically, because Ethereum did not receive the machines from the defendants, Ethereum was unable to use the machines to mine Bitcoin.  (Id.)

24. As discussed above, because of the defendants' failure to deliver, Ethereum ordered substitute machines from DB Technology on May 28, 2021.  DB Technology delivered those machines to Ethereum on September 15, 2019.  (Baric Aff. ¶25.)  Therefore, between the end of May 2019 and September 15, 2019, Ethereum was deprived of the ability to mine Bitcoin that it would have been able to mine if the defendants had performed.  (Id.)

25. Baric has credibly testified that during the period from May 31, 2019 to September 15, 2019, Ethereum would have earned $255,036.28 in profits from Bitcoin mining using the machines that the defendants promised, but did not deliver.  (See also Baric Aff. ¶¶26-27.)

### E. Procedural History

26. Ethereum commenced this action on August 26, 2019.  (Neidl Aff. Exh. 1.)

27. Among other things, the Complaint sought damages equal to a refund of the purchase price that Ethereum paid for the undelivered machines.  (Neidl Aff Exh. 1, ¶59.)

28. Among other things, the Complaint sought "cover" damages for the added cost of procuring substitute goods.  (Neidl Aff. Exh. 1, ¶63.)

29. Among other things, the Complaint sought consequential damages in the form of lost profits, by virtue of Ethereum's lost opportunity to mine Bitcoin from the undelivered machines. (Neid. Aff. Exh. 1, ¶40.)

30. The defendants initially appeared and Answered the Complaint. (Neidl Aff. Exh. 2.)

31. However, defendants' counsel subsequently withdrew from the case. (Neidl Aff. Exh. 3.) The defendants then briefly appeared through substitute defense counsel, but the subsequent defense counsel also withdrew from the case. (Neidl Aff. Exh. 4.)

32. In a January 22, 2021 Order granting the second defendants' counsel's motion to withdraw, the Court ordered that if the defendants did not enter the appearance of a successor counsel within 60 days of then, the "plaintiffs may seek leave to move for a judgment by default." (Neidl Aff. Exh. 4.)

33. The defendants did not appear through new counsel, or otherwise, at any time after the Court's January 22, 2021 order. On May 5, 2021, the Court issued another order, stating that "plaintiff may seek leave to move for a judgment by default." (Neidl Aff. Exh. 5.)

34. On May 25, 2021, upon application by the plaintiff, the Clerk filed a Clerk's Certificate of Default against both defendants. (Neidl Aff. Exh. 6.)

35. On June 4, 2021, the plaintiff filed and served a motion for default judgment against both defendants.

36. On July 9, 2021, the Court granted the default judgment. (Neidl Aff. Exh. 7.) Therein, the Court: "Ordered, adjudged and decreed: That plaintiff Ethereum Ventures, LLC have judgment against defendants Chet Mining Co. LLC and Chet Stojanovich jointly and severally, in an amount to be determined by inquest before the designated Magistrate Judge." (Id.)

37. The Magistrate Judge scheduled this inquest by Order dated July 12, 2021. (Neidl Aff. Exh. 8.)

**CONCLUSIONS OF LAW**

**I.     Applicable Law**

38.     The plaintiff, Ethereum, is a North Carolina limited liability company with a principal place of business in North Carolina.  (Baric Aff. ¶1 & n.1.)  Defendants Chet Stojanovich and CMC are domiciled in New York.  (See ¶¶2-3 in Findings of Fact, above.)

39.     "Where a district court sits in diversity, it must apply the choice of law rules of the forum in which it sits."  Federal Ins. Co. v. SafeNet, 817 F. Supp. 2d 290, 301 (S. D.N.Y. 2011).  "In contract disputes, New York courts apply the 'center of gravity' or 'grouping of contacts' theory of conflict of laws, which requires a court to apply 'the law of the place which has the most significant contacts with the matter in dispute.'"  Id.  This includes consideration of such factors as (1) the place of contracting, (2) the place of negotiation and performance, (3) the location of the subject matter of the contract, and (4) the domicile or place of business of the contracting parties.  O'Neill v. Yield House, 964 F. Supp. 806, 809 (S.D.N.Y. 1997).

40.     In this case, the usual factors considered are somewhat evenly distributed.  JohnPaul Baric of Ethereum and Chet Stojanovich negotiated their transaction by phone and email from their respective jursidctions.  (Baric Aff. ¶4.)  Therefore, the "place of negotiation" was virtual and occurred in both jurisdictions.

41.     The "place of performance" was also bilateral, in that Stojanovich agreed from New York to deliver the machines, but the machines were ultimately supposed to be delivered to a site in Iowa where Ethereum intended to operate them.

42.     The "place of contracting" arguably tips in favor of New York, because Chet Stojanovich generated the written order invoices that memorialized Ethereum's order of the two batches of crypto miners, and emailed them to Ethereum from his domicile in New York.  (Baric Aff. ¶¶9, 13.)

7

43. The defendants also received Ethereum's payments in New York and have continued to hold those monies here (if they have not already been spent from here). (Baric Aff. ¶¶8, 11, 14.)

44. Therefore, under the circumstances, New York has the most significant contacts with the transactions, and New York law should apply.

45. Nevertheless, the applicable provisions of the New York and North Carolina Uniform Commercial Codes are identical.

## II. Ethereum's Refund Damages Pursuant to UCC §2-711(1).

46. The above-described transactions were for the purchase of goods. Accordingly, it was and is governed by the Uniform Commercial Code. See N.Y. UCC §2-102; see also North Carolina General Statutes ("N.C.G.S.A.") §25-2-102.

47. When a buyer contracts to purchase goods and the defendant fails to deliver, UCC §2-711(1) allows the frustrated buyer to recover, among other things, "so much of the price as has been paid." See also Kashi v. Gratsos, 790 F.2d 1050, 1056 (2d Cir. 1986); Federated Retail Holdings v. Sanidown, 2010 WL 5298113, at *7 (S.D.N.Y. 2010). Allied Semi-Conductors v. Pulsar Components, 907 F. Supp. 618, 630 (E.D.N.Y. 1995); Pittman v. Henry Moncure Motors, 2015 WL 5123896, at *14 (N.C. Ct. App. 2015).

48. As set forth in the Findings of Fact, Ethereum paid the defendants the net sum of $177,600.45 to purchase two batches of cryptocurrency mining computers, which the defendants never delivered.

49. Pursuant to UCC §2-711(1), Ethereum is entitled to recover $177,600.45 in damages against the defendants, as compensation for the purchase price that Ethereum paid.

## III. Ethereum's "Cover" Damages Pursuant to UCC §2-711(1) and §2-712.

50. In addition to refund damages, UCC §2-711(1) allows a frustrated buyer of undelivered goods to obtain "cover" damages pursuant to UCC §2-712, to the extent that the buyer incurred a loss

8

purchasing substitute goods from an alternative source. See also Kashi, 790 F.2d at 1056 (recognizing that a frustrated purchaser is entitled to damages for the paid purchase price plus the other remedies listed in §2-711[1][a] and [b]); Allied Semi-Conductors, 907 F. Supp. at 630 (holding that UCC §2-711[1][a] allows an aggrieved buyer a "return of the purchase price as well as other remedies such as cover"); Harrington Mfg. v. Logan Tontz Co., 253 S.E.2d 282, 286 (N.C. Ct. App. 1979)("In addition to allowing the recovery of so much of the purchase price as has been paid … [under §2-711] the buyer is entitled to "cover" by procuring substitute goods for those found to be nonconforming").

51. "Cover" damages are defined in UCC §2-712. The New York and North Carolina versions of §2-712 are identical to one another. Compare N.Y. UCC §2-712 and N.C.G.S.A. §25-2-712. That section provides that the frustrated buyer "may 'cover' by making in good faith and without unreasonable delay any reasonable purchase of or contract to purchase goods in substitution for those due from the seller." Section 2-712 also provides that the measure of damages for cover is:

> The buyer may recover from the seller as damages the difference between the cost of cover and the contract price together with any incidental or consequential damages as hereinafter defined (Section 2-715), but less expenses saved in consequence of the seller's breach.

52. As set forth in the Findings of Fact, Ethereum promptly purchased S9 miners from an alternate supplier (DB Technology), after the defendants failed to deliver, on May 28, 2019. (Baric Affidavit ¶¶21 – 23.) The price that the defendants had offered (and failed to deliver upon) was considerably below market value for the would-be batch of 912 S9 miners. Purchasing from the alternate supplier cost Ethereum an extra $196,536.00 in purchase price above and beyond the contract price with the defendants. (Id. ¶22.)

53. Accordingly, the Ethereum is entitled to an additional $196,536.00 in damages for its "cover" cost, pursuant to UCC §§2-711(1) and 2-712.

**IV.     Ethereum's Lost Profit Damages**

54.     The "cover" statute (UCC §2-712) also allows the buyer to recover "any incidental or consequential damages as hereinafter defined." Consequential damages include, among other things, "any loss resulting from general or particular requirements and needs of which the seller at the time of contracting had reason to know and which could not reasonably be prevented by cover or otherwise." UCC §2-715(2)(a).

55.     "Consequential damages include lost profits." Federated Retail Holdings, 2010 WL 5298113, at *8, citing RIJ Pharmaceutical v. Ivax Pharmaceuticals, 322 F. Supp. 2d 406, 415 (S.D.N.Y. 2004); see also B.B. Walker v. Ashland Chemical, 474 F. Supp. 651 (M.D.N.C. 1979)("The lost profits claims by Harrelson likewise fall under the ambit of incidental or consequential damages, and therefore are covered by N.C.G.S. s 25-2-715[2][a]")(applying North Carolina UCC).

56.     As set forth in the Findings of Fact, Ethereum incurred lost profits as a result of the defendants' failure to deliver the mining computers breach. Without the miners that the defendants failed to deliver, Ethereum lost the opportunity to use those machines to mine Bitcoin, and were so deprived until they received substitute miners from their alternate supplier (DB Technology) on September 15, 2021. (Baric Affidavit ¶¶24-27.) The proof credibly demonstrates that Ethereum's resulting lost profits from May 31, 2019 to September 15, 2019 was $255,036.28. (Baric Affidavit ¶¶24-27.)

57.     There cannot be any serious doubt that the defendants "had reason to know" that Ethereum stood to incur significant lost profits if it did not receive the machines. UCC §2-715(2)(a). Cryptocurrency mining computers are used for one purpose: to mine Bitcoin for profit. (Baric Affidavit ¶5.) J.P. Baric of Ethereum communicated with defendant Stojanovich during negotiations, and communicated that Ethereum was a crypto mining business and intended to use the machines to mine Bitcoin. (Id.)

58. Moreover, since Ethereum ordered hundreds of miners from the defendants in this transaction, it would have been obvious to Stojanovich that Ethereum was a commercial mining operation, and that the loss of an opportunity to use mining computers due to non-delivery would cost Ethereum income.

59. Therefore, Ethereum is entitled to a damages award of $255,036.28 for lost profits.

## V.   Total Principal Damages

60. As set forth above, Ethereum's total, principal damages against the defendants total $633,820.22 as follows:

| | |
|---|---|
| Compensation for the paid purchase price: | $177,600.45 |
| "Cover" damages: | $196,536.00 |
| Lost profits: | $255,036.28 |
| Total Principal Damages = | **$629,172.73** |

61. In accordance with the Court's default judgment dated July 9, 2021 (Neidl Aff. Exh. 7), judgment shall be awarded to the plaintiff "against Chet Mining Co. LLC and Chet Stojanovic jointly and severally," in that principal amount.

## VI.   Prejudgment Interest.

62. The plaintiff has requested pre-judgment interest, to be awarded from the date that the plaintiff commenced this action (August 26, 2019) through the date the Court awards the monetary default judgment.

63. A federal court sitting in diversity applies the pre-judgment interest law of the forum state, over non-federal claims. See Quincy Fire Ins. Co. v. N.Y. Central Mut. Fire Ins. Co., 89 F. Supp.3d 291 (N.D.N.Y. 2014).

64. In New York claims for breach of contract accrue pre-judgment interest at the rate of 9% per year.  CPLR §5004.

65. At 9%, annual interest on the principal damages sum of $629,172.73, is $56,625.55 ($629,172.73 x 9% = $56,625.55).

66. The per *diem accrual* of interest at that rate is $155.14 per day ($56,625.55 annual interest divided by 365 days = $155.14).

67. Therefore, the plaintiff is entitled to pre-judgment interest at the rate of $155.14 per day from August 26, 2019 to the date the Court awards the monetary default judgment, which shall be reflected in the judgment. In accordance with the Court's default judgment dated July 9, 2021 (Neidl Aff. Exh. 7), said interest shall be taxed "against Chet Mining Co. LLC and Chet Stojanovic jointly and severally."

Dated: Troy, New York
August 12, 2021

Respectfully submitted,

E. STEWART JONES HACKER MURPHY LLP

By: Benjamin F. Neidl
Attorneys for the Plaintiff
28 Second Street
Troy, N.Y.  12180
(518)274-5820
Email: Bneidl@joneshacker.com