```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
ETHEREUM VENTURES LLC,

                                        Plaintiff,          REPORT & RECOMMENDATION

                        -against-                                      INQUEST

CHET MINING CO LLC and CHET                                     19-CV-7949 (LLS) (KHP)
STOJANOVICH,

                                        Defendants.
-----------------------------------------------------------------X
```

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 10/20/2021

**TO:** THE HONORABLE LOUIS L. STANTON, UNITED STATES DISTRICT JUDGE
**FROM:** THE HONORABLE KATHARINE H. PARKER, UNITED STATES MAGISTRATE JUDGE

Plaintiff Ethereum Ventures LLC commenced this action against Defendants Chet Mining Co LLC and Chet Stojanovich for breach of contract because Defendants failed to deliver computers designed to mine Bitcoin and failed to fully refund Plaintiff. Plaintiff requests an award of $629,172.73 for actual and consequential damages and prejudgment interest. After entry of default against Defendants, the Honorable Louis L. Stanton referred this action to me for a report and recommendation on damages.

For the reasons stated below, I respectfully recommend that the Court enter judgment for Plaintiff in the amount of $629,139.93, prejudgment interest from August 26, 2019 to the date of entry of judgment, and post-judgement interest pursuant to 28 U.S.C. § 1961.

## BACKGROUND

It is well-settled that in light of Defendants' default, Plaintiff's allegations, with the exception of those related to damages, are accepted as true. *See Finkel v. Romanowicz,* 577 F.3d 79, 84 (2d Cir. 2009) (citing *Au Bon Pain Corp. v. Artect, Inc.,* 653 F.2d 61, 65 (2d Cir. 1981)). Accordingly, the following facts are established as a result of Defendants' default:

1

- Plaintiff is a North Carolina limited liability company with a principal place of business in North Carolina. (Complaint ¶6 (ECF No. 1.)) Plaintiff's sole member is Aurum Capital Ventures, Inc., a North Carolina corporation with a principal place of business in Raleigh, North Carolina. (Affidavit of Johnpaul Baric ¶ 1 (ECF No. 59) ("Baric Aff.")). Plaintiff is in the business of cryptocurrency mining and uses crypto mining computers for those operations. (Complaint ¶ 21; Baric Aff. ¶ 2).

- Defendant Chet Mining Co LLC is a limited liability company which maintains its headquarters in New York, New York. (Answer ¶ 2 (ECF No. 15.)) Defendant Chet Stojanovich is the owner of Chet Mining Co. LLC and resides in New York, New York. (Answer ¶ 2.)

- In April 2019, Plaintiff negotiated with and paid Defendants for mining computers to be delivered in mid-May 2019. (Baric Aff. ¶¶ 4-11). The order consisted of 912 "model S9 Antminers" ("S9 Antminers"), computers specifically designed to mine cryptocurrency, for a price of $190 per miner, for a total of $173,280.00. (Complaint ¶¶ 22-26; Baric Aff. ¶7).

- In May 2019, Plaintiff negotiated a second order of mining computers from the Defendants. (Complaint ¶¶ 28-29; Baric Aff. ¶ 12). The order consisted of 67 "model S17s," computers specifically designed to mine cryptocurrency, for a total price of $134,000. (Baric Aff. ¶13). Plaintiff made a down payment for these computers of 5.69 Bitcoin, equivalent to $39,970.94 USD. (Baric Aff. ¶¶ 14-15).

- The Defendants failed to deliver any of the mining computers. (Complaint ¶ 31; Baric Aff. ¶¶ 16-17).

- Defendants provided Plaintiff a partial refund of 4.85443626 Bitcoin, equivalent to $35,650.49 USD.  (Baric Aff. ¶ 18).

- The net amount Plaintiff paid Defendants was $177,600.45.  (Baric Aff. ¶ 20).

- Plaintiff ordered replacement computers for the 912 S9 Antminers from an alternate seller at a higher price of $405.50 per miner, a difference of $215.50 per miner.  Plaintiff received the replacements from the alternate vendor on September 15, 2019.  (Baric Aff. ¶¶ 21-22).  As such, Plaintiff paid $196,536.00 more for the 912 S9 Antminers than it had anticipated paying under the contract with Defendants.[1]  (Baric Aff. ¶ 23).

- When mining Bitcoin, miners such as Plaintiff typically run their computers continuously each day generating daily revenue that fluctuates based on the price of Bitcoin.  (Baric Aff. ¶ 27).  The price paid to miners is determined by a publicly available daily hash price for each computer per day.  (Baric Aff. ¶ 27(a)).  Each type of computer has a pre-determined hash rate (i.e., speed) determined by the manufacturer.  The hash rate for S9 Antminers is 13.5 TH.  (Baric Aff. Ex. K).

- Plaintiff's sole daily expense relating to its mining operations was its daily fixed electricity cost of $1,330.[2]  (Baric Aff. ¶ 27(d); Baric Aff. Ex. K).

- To compute Plaintiff's daily profit, Plaintiff takes the total amount of computers it owns, multiplies that by the daily hash rate of each computer, and multiplies that by the publicly posted daily hash rate paid to miners.  (Baric Aff. ¶ 27).  This exercise produces

---

[1] Plaintiff ordered 1200 computers from the alternate vendor but seeks "replacement" or "cover" costs for only 912 computers—the amount ordered from Defendants.
[2] Plaintiff appears to have rounded the electricity costs to the nearest dollar, which the Court accepts in the calculation of damages.

the total revenue per day generated by the computers. Plaintiff then subtracts its daily energy costs for running the computers to arrive at its profit. As an example, to compute Plaintiff's daily profit on September 5, 2019, 912 S9 Antminers would have generated $2,711.33 in revenue (912 X daily hash rate of $0.220218478). (Baric Aff. ¶ 27(c); Baric Aff. Ex. K). After subtracting Plaintiff's daily electricity cost of $1,330 to run the computers, Plaintiff would have made $1,381.33 in total profit on that day. (Baric Aff. ¶ 27(e); Baric Aff. Ex. K).

**Procedural History**

Plaintiff filed this action on August 26, 2019 against Chet Mining Co LLC and Chet Stojanovich. (ECF No. 1.) Counsel for both Defendants filed a Notice of Appearance on December 5, 2019. (ECF No. 9.) After multiple extensions, Defendants filed an answer on January 6, 2020. (ECF No. 15.) Counsel for Defendants filed a motion to withdraw as attorney on January 7, 2020, which the Honorable Louis L. Stanton granted on February 7, 2020. (ECF Nos. 17, 19.) On October 5, 2020, substitute counsel for Defendants filed Notices of Appearance. (ECF Nos. 30, 31.) However, on January 15, 2021, Defendants' substitute counsel filed a motion to withdraw. (ECF Nos. 34, 35.) On January 22, 2021, the Honorable Louis L. Stanton granted the motion and provided Defendants 60 days to obtain successor counsel, and if Defendants failed to do so, Plaintiff could pursue a default judgment. (ECF No. 36.) The Clerk of Court entered a certificate of default on May 25, 2021. (ECF No. 44.) On July 9, 2021, the Honorable Louis L. Stanton issued a default judgment and referred this matter to the undersigned for an inquest on damages. (ECF Nos. 51, 53.)

Plaintiff served all papers in connection with the present motion upon Defendants on July 26, 2021.  (ECF Nos. 53, 54, 55, 62, 63.)  This Court held an inquest hearing on September 23, 2021 and provided the Defendants with an opportunity to appear and object.  Defendants did not file any written submissions or appear at the hearing.  After review of the submissions, I respectfully recommend that Plaintiff be awarded damages as set forth in detail below.

## DISCUSSION

### I.   *Inquest Hearing and Proof of Damages*

Federal Rule of Civil Procedure ("Rule") 55 governs judgments against a party that has failed to plead or otherwise defend itself in an action. *Au Bon Pain Corp. v. Artect, Inc.*, 653 F.2d 61 (2d Cir. 1981) (defendant's ongoing failure to appear supported failure to plead for the purpose of entry of default).  A default constitutes an admission of all well pleaded factual allegations in the complaint, and the allegations as they pertain to liability are deemed true. *Greyhound Exhibitgroup, Inc. v. E.L.U.L. Realty Corp.*, 973 F.2d 155, 158 (2d Cir. 1992).  However, a plaintiff still bears the burden of establishing its entitlement to recovery and thus must substantiate its claims with evidence to prove the extent of their damages.  *Id.*  Thus, even when a defendant has defaulted, a substantive analysis of the alleged claims is required to determine whether the plaintiff may be awarded damages, and proof of damages is required. *Flaks v. Koegel*, 504 F.2d 702, 707 (2d Cir. 1974).  Here, as noted above, a damages inquest hearing was held.  Plaintiff filed papers supporting its request for damages, including a memorandum of law, Plaintiff's affidavit, proposed findings of fact and conclusions of law, an attorney affirmation, and several supporting exhibits.  (ECF Nos. 58-61.)  At the inquest hearing,

Plaintiff's president and owner JohnPaul Baric, also testified to explain the calculations related to its lost profits as a result of the breach. (Inquest Hearing, Sept. 23, 2021).

## II. *Breach of Contract*

The breach of contract in this action relates to the sale of computers – a good governed by the Uniform Commercial Code. *See* N.Y. UCC §2-105. Under New York law, a party alleging a breach of contact must prove the following: "(1) a contract; (2) performance of the contract by one party; (3) breach by the other party; and (4) damages." *First Invests. Corp. v. Liberty Mut. Ins. Co.*, 152 F.3d 162, 168 (2d Cir. 1998) (quoting *Rexnord Holdings, Inc. v. Bidermann*, 21 F.3d 522, 525 (2d Cir. 1994)).[3]

Plaintiff has established the necessary elements of a breach of contract claim. Based on a review of the allegations in the Complaint and Plaintiff's affidavit, which includes the pertinent invoices that note the description of the goods to be provided and price, and receipts from Defendants, Plaintiff has established the existence of a contract. *See* (Complaint ¶¶20-68; Baric Aff ¶¶ 5-19). The parties primarily negotiated the sale of the computers via phone and e-mail. (Baric Aff. ¶ 4). On April 24, 2019, Defendant Stojanovich offered to sell 912 S9 Antiminers for $190 each, and Plaintiff accepted. (Baric Aff. ¶ 7). Defendants promised to

---

[3] As a threshold question, the Court must determine what law should be applied to Plaintiff's claims. In a diversity action, the Court applies the choice of law rules of the forum state. *Forest Park Pictures v. Universal Television Network, Inc.*, 683 F.3d 424, 433 (2d Cir. 2012) (citations omitted). In New York, the forum state, the first step in a choice of law analysis is to determine whether an actual conflict exists between the laws of the jurisdictions involved. *Id.* An actual conflict exists when there are "relevant substantive differences that could have a significant impact on the outcome of the case." *Fin. One Pub. Co. v. Lehman Bros. Special Fin., Inc.*, 414 F.3d 325, 332 (2d Cir. 2005). If there is no conflict, then a federal court in New York should apply New York law. *See Alitalia Linee Aeree Italiane, S.P.A. v. Airline Tariff Publ'g Co.*, 580 F. Supp. 2d 285, 290 (S.D.N.Y. 2008).
    Here, the relevant jurisdictions to consider are New York and North Carolina. There is no conflict between the laws of New York and North Carolina with respect to the breach of contract claims governed by the Uniform Commercial Code. Accordingly, this Court applies New York law.

deliver the first batch of computers by mid-May 2019.  (Baric Aff. ¶ 17).  For the first order, Plaintiff completed performance of the contract by transferring a total of $173,280 to the Defendants in two installments on April 24, 2019 and April 29, 2019.  (Baric Aff. ¶ ¶8, 11; Baric Aff. Ex. A-D).  For the second order, Plaintiff performed by sending Defendants 5.69 Bitcoin.  (Baric Aff. ¶ 14; Baric Aff. Ex. F).  Defendants breached the contract by failing to deliver any of the computers.  Thus, Plaintiff is entitled to damages under the Uniform Commercial Code.

### III. *Damages*

Under UCC §2-713(1), "the measure of damages for non-delivery . . . is the difference between the market price at the time when the buyer learned of the breach and the contract price with any incidental and consequential damages[.]"  Plaintiff asserts that it is entitled to receive a refund of money paid to Defendants, "cover" damages, and lost profits.  Each are discussed in turn below.

#### a. Refund

When a buyer contracts to purchase goods and the seller fails to deliver, UCC §2-711(1) allows the frustrated buyer to recover, among other things, "so much of the price as has been paid[.]" *See Kashi v. Gratsos*, 790 F.2d 1050, 1056 (2d Cir. 1986).  Here, Plaintiff paid Defendants $173,280 for 912 S9 Antminers in two wire transfers, the first in the amount of $100,000 on April 24, 2019, and the second in the amount of $73,280 on April 29, 2019.  (Baric Aff. at ¶¶ 8, 11).  Additionally, Plaintiff sent 5.69 Bitcoin (equivalent to $39,970.94) on May 11, 2019 towards a second order for 67 model S17 miners.  (Baric Aff. ¶ 14).  Upon request for a refund, Defendants provided Plaintiff a partial refund of 4.85443626 Bitcoin (equivalent to

7

$35,650.49) on May 17, 2019.  (Baric Aff. ¶ 20).  Thus, the net amount Plaintiff paid to Defendant was $177,600.45.  (Baric Aff. ¶ 20).  This same amount is the refund due to Plaintiff.

    b. *Cover*

In addition to refund damages, UCC §2-711(1) allows a frustrated buyer of undelivered goods to obtain "cover" damages pursuant to UCC §2-712 to the extent that the buyer incurred a loss purchasing substitute goods from an alternative source.  *Kashi*, 790 F.2d at 1056.  "Cover" damages allow a frustrated buyer to "'cover' by making in good faith and without unreasonable delay any reasonable purchase of or contract to purchase goods in substitution for those due from the seller."  N.Y. UCC § 2-712.  Furthermore, "the buyer may recover from the seller as damages the difference between the cost of cover and the contract price[.]"  *Id.*

Here, Defendants were to deliver the 912 S9 Antminer computers to Plaintiff in mid-May 2019 but failed to do so.  (Baric Aff. ¶ 19).  Plaintiff then purchased replacement S9 Antminers from an alternate seller at a higher cost.  (Baric Aff. ¶¶ 21-22).  Instead of paying $190 per S9 Antminer as contracted with Defendants, Plaintiff was forced to pay $405.50 each, a difference of $215.50, for a total "cover" cost difference of $196,536.00.[4]  (Baric Aff. ¶ 22).  Plaintiff does not seek "cover" costs for the model S17s it ordered but that Defendants failed to deliver, as Plaintiff did not purchase replacement model S17s.  Accordingly, I recommend that Plaintiff be awarded "cover" damages of $196,536.00.

    c. *Lost Profit*

In addition to refund and cover damages, the UCC allows for the recovery of consequential damages.  Consequential damages include, "any loss resulting from general or

---

[4] Plaintiff is not requesting cover damages for the shipping costs of the replacement order.

particular requirements and needs of which the seller at the time of contracting had reason to know and which could not reasonably be prevented by cover or otherwise." UCC §2-715(2)(a). "Under New York law, consequential damages for a breach of contract or warranty claim can include loss of goodwill, including the loss of customers, future profits, and harm to business reputation." *RIJ Pharmaceutical v. Ivax Pharmaceuticals*, 322 F. Supp. 2d 406, 415 (S.D.N.Y. 2004) (quoting *Hangzhou Silk Import and Export Corp. v. P.C.B. Intern. Industries*, 2002 WL 2031591, *7 (S.D.N.Y. Sept. 5, 2002)).

      Here, Plaintiff's Bitcoin mining operations suffered a loss because of Defendants' non-performance insofar as Plaintiff planned to utilize and gain revenue from the computers it purchased from Defendants commencing as soon as the computers were delivered. When Defendants failed to deliver the computers in mid-May as promised, Plaintiff had to scramble to order replacement computers, which it did on May 28, 2019. But, the replacement computers did not arrive until September 15, 2019. When the sale was made, Plaintiff communicated to Defendant Stojanovich that the computers were going to be used to mine Bitcoin. (Baric Aff. ¶ 5). Plaintiff chose the specific S9 Antminers computers because they are well known for their speed in cryptocurrency mining. *See Generally* Daniel Foelber, *Should You Buy Bitcoin or Just Mine It? It's Complicated.*, The Motley Fool (Apr. 6, 2021 11:56 AM), https://www.fool.com/investing/2021/02/08/should-you-buy-bitcoin-or-just-mine-it-its-complic/ (". . . Antminer S9, which has a hash rate of just 13.5 trillion per second, can break even at $24,730 bitcoin"). Thus, Defendants were aware or should have been aware that failing to deliver the computers would cause Plaintiff financial loss.

Consequently, Plaintiff seeks lost profits for the period May 31, 2019 through September 15, 2019—the 108-day period it would have used the computers and earned profits but for Defendants' failure to fulfill the contract. (Baric Aff. ¶ 25). Plaintiff mitigated damages by ordering the replacement computers; it represented that given the mid-May delivery date, the computers would have been up and running by no later than May 31, 2019, and therefore uses May 31, 2019 as the start of the period when it began to lose profits based on Defendants' breach. Plaintiff uses September 15, 2019 as the end of the lost profit period because it received the replacement computers on that date.

Plaintiff provided the Court with a rate sheet showing rates paid to Bitcoin miners on a daily basis from May 31, 2019 to September 15, 2019, Plaintiff's cost of electricity, and the daily profit it expected to earn after expenses. (Baric Aff. Ex. K). Assuming Plaintiff had use of the computers for this period, Plaintiff would have ran all 912 computers continuously at a hashrate of 13.5 TH per machine, earning a varying hash price per day based on the trading price of Bitcoin. Having reviewed the rate sheet and checked the math, the total amount that Plaintiff would have received over the period is $398,643.48. (Baric Aff. ¶ 26; Baric Aff. Ex. K). Plaintiff's electricity costs for running the computers was a fixed cost of $1,330.00 per day and $143, 640 for the total period. (Baric Aff. ¶ 27). The total rates that would have been paid to Plaintiff for the period less electricity costs results in a net amount of $255,003.48 in profit over the period.[5] (Baric Aff. ¶¶ 26, 27; Baric Aff. Ex. K). Accordingly, I respectfully recommend that Plaintiff be awarded consequential damages in this amount of $255,003.48.

---

[5] In the Court's review of Plaintiff's inquest submission, the Court notes that Plaintiff slightly miscalculated the amount of lost profits. Plaintiff computed lost profits of $255,036.28, but the Court's computation resulted in the figure $255,003.48.

Based on the above, the total damages suffered by Plaintiff is $629,139.93, representing Plaintiff's refund damages of $177,600.45, "cover" costs of $196,536.00 associated with having to purchase more expensive computers from another vendor, and lost profits of $255,003.48 for the period Plaintiff was without use of the S9 Antminers (i.e., date when Defendants should have delivered computers to date when replacement computers were received).

### IV. *Prejudgment Interest on Damages*

Plaintiff also requests an award of prejudgment interest. A federal court sitting in diversity applies the prejudgment interest law of the state governing the claims. *AGCS Marine Ins. Co. v. World Fuel Servs., Inc.*, 220 F. Supp. 3d 431, 440 (S.D.N.Y. 2016). This Court applies New York law to determine whether to award prejudgment interest because it applies New York law to the substantive claims. See *Schwartz v. Liberty Mut. Ins. Co.*, 539 F.3d 135, 147 (2d Cir. 2008) ("Under New York choice of law principles, the allowance of prejudgment interest is controlled by the law of the state whose law determined liability on the main claim.") (internal quotation marks, citation and alterations omitted). Under New York law, "[i]nterest is generally mandatory" upon a sum awarded for breach of contract. *Rhodes v. Davis*, 628 F. App'x 787, 792 (2d Cir. 2015) (citing N.Y. C.P.L.R. §§ 5001 (a) and 5004). "Interest shall be computed from the earliest ascertainable date the cause of action existed, except that interest upon damages incurred thereafter shall be computed from the date incurred." N.Y. C.P.L.R. § 5001 (b). In New York, interest accrues at 9 percent per year. CPLR §5004 (2012). At 9 percent, the annual interest on the principal damages sum of $629,139.93 is $56,622.59 ($155.13 per day).

Accordingly, I respectfully recommend an award of prejudgment interest at the rate of $155.13 per day from August 26, 2019 through the date of entry of judgment.

V.  *Post-judgment Interest on Damages*

Plaintiff does not seek post-judgment interest in either its Complaint or inquest submission. However, an award of post-judgment interest is mandatory pursuant to 28 U.S.C. § 1961. *See Bleecker v. Zetian Sys., Inc.*, 2013 WL 5951162, at *2 (S.D.N.Y. Nov. 1, 2013) ("Although the Complaint did not seek relief in the form of post-judgment interest, such relief is mandatory under federal law.") (citing *Westinghouse Credit Corp. v. D'Urso*, 371 F.3d 96, 100 (2d Cir. 2004)).

Accordingly, I respectfully recommend post-judgment interest at the statutory rate calculated by the Clerk of the Court pursuant to 28 U.S.C. § 1961.

## CONCLUSION

For the reasons stated above, I respectfully recommend that Plaintiff be awarded: (a) principal damages in the amount of $629,139.93, representing Plaintiff's actual damages, "cover" costs, and lost profits; (b) prejudgment interest on such damages, at the interest rate of $155.13 per day from August 26, 2019 through the date of entry of judgment; and (c) post-judgment interest pursuant to 28 U.S.C. § 1961.

Dated: October 20, 2021
      New York, New York

Respectfully submitted,

*Katharine H. Parker*
_____
KATHARINE H. PARKER
United States Magistrate Judge

**NOTICE**

**The parties shall have fourteen days from the service of this Report and Recommendation to file written objections to the Report and Recommendation, pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure.** *See also* **Fed. R. Civ. P. 6(a), (d) (adding three additional days only when service is made under Fed. R. Civ. P. 5(b)(2)(C) (mail), (D) (leaving with the clerk), or (F) (other means consented to by the parties)).**

**If any party files written objections to this Report and Recommendation, the opposing party may respond to the objections within fourteen days after being served with a copy. Fed. R. Civ. P. 72(b)(2). Such objections shall be filed with the Clerk of the Court, with courtesy copies delivered to the chambers of the Honorable Louis L. Stanton at the United States Courthouse, 500 Pearl Street, New York, New York 10007, and to any opposing parties.** *See* **28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b). Any requests for an extension of time for filing objections must be addressed to Judge Stanton. The failure to file these timely objections will result in a waiver of those objections for purposes of appeal.** *See* **28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b);** *Thomas v. Arn*, **474 U.S. 140 (1985).**